IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
John L. Kane
U.S. Senior District Judge

Criminal Action **No. 13-cr-87-JLK**

UNITED STATES OF AMERICA

    Plaintiff,

v.

REGINA MOODY,

    Defendant.

---
ORDER ON GUIDELINE CALCULATIONS
---

Kane, J.

At sentencing I must rule on any disputed portion of the Presentence Report or other controversial matter or determine that a ruling is unnecessary because it will not affect sentencing or because such matter will not be considered. F.R.Crim.P. 32(i)(3)(B). Numerous objections by both the Government and the Defendant have been filed in this matter regarding the appropriate Guideline calculations as calculated by the Probation Office and I will rule on them in advance of the sentencing hearing and allow counsel to make whatever further objections or responses each might care to make in light of this Order. The Guidelines must be considered first and determined to have been correctly calculated. Thereafter, I am to consider them advisory. I must consider the sentencing factors in 18 U.S.C. Section 3553.

I. SOPHISTICATED MEANS

1

Both the Government and the Defendant object to the Presentence Report's application per Section 2B1.1(b)(10)(C) of a two level enhancement for an offense involving sophisticated means. The definition of "sophisticated means" is an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense." The Probation Office has considered the objections and concludes the enhancement does not apply in this case.

As detailed in the Plea Agreement, the Defendant sent payroll data from her employer, AG, to a non-Colorado based third party payroll processing company, Automatic Data Processing, Inc. ("ADP"), so that ADP could generate payroll checks for AG's employees. This was part of Defendant's normal duties. To effectuate her scheme of unlawfully diverting AG funds to her own personal gain, the Defendant sent wire requests to ADP to have it generate unauthorized payroll checks to the Defendant. She would label each of these unauthorized payroll checks as a "negative advance deduction." Although the unauthorized checks were issued through an AG subsidiary (NPS), that fact does not make the scheme especially complex or especially intricate. AG, not the Defendant, established NPS and that subsidiary conducted all of AG's bill paying services and payroll activities. Thus, other than labeling the fraudulently obtained checks "negative advance deductions," the Defendant did nothing different than she would have for any of the lawful payroll activity.

As such, the parties summarize that the fraudulent scheme boiled down to the Defendant requesting the issuance of additional checks. Having confirmed through case law that "sophisticated means" usually requires more complexity than presented here, I ultimately agree with the parties, but I do not think the issue is as clear cut as it may seem. The Defendant used multiple bank accounts and the fraud was ongoing for ten years. Cases consistently state that

multi-state activity and the length of the fraud are relevant considerations; ADP is located outside of Colorado and Defendant worked her fraud for a decade. In other words, there are some complexities involved in this case, but I do not think they rise to the level of sophistication or especially intricate means of effectuating the fraud. While the processes of meeting payroll obligations may be viewed as sophisticated, they are the product of the corporation and not the fraud of the Defendant. The objections are sustained.

## II. FINANCIAL INSTITUTION

The Defendant objects to the two level enhancement for deriving more than $1 million in gross receipts from one or more financial institutions on the grounds that AG was not a financial institution as contemplated by Section 2B1.1 (b)(15)(A). The Government asserts the enhancement should not apply because it did not consider AG to be a financial institution within the ambit of the statute at the time it entered into a plea agreement with the Defendant and hence believes it is foreclosed from pursuing this enhancement.

Neither side disputes that the Defendant "derived more than $1 million in gross receipts" from her offense, but both argue that AG should not be covered as a "financial institution." The guideline defines "financial institution" as:

> "any institution described in 18 U.S.C. 20, 656,657, 1005, 1006, 1007, or 1014; any state or foreign bank, trust company, credit union, insurance company, **investment company**, mutual fund, savings (building and loan) association, union or employee pension fund; any health, medical, or hospital insurance association; brokers and dealers registered, or required to be registered, with the Securities and Exchange Commission; futures commodity merchants and commodity pool operators registered, or required to be registered, with the Commodity Futures Trading Commission; and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," primarily include large pension funds that serve

3

> many persons (e.g., pension funds or large national and international organizations, unions, and corporations doing substantial interstate business), and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

Section 2B1.1 (b)(15)(A)(emphasis added). AG is labeled unambiguously in the charging Information as a "private real estate investment company." By her plea of guilty and in the F.R. Crim.P. 11 colloquy attending it, the Defendant admitted just that. Accordingly, I fail to see how it can be seriously contested that AG does not qualify as a financial institution. The guideline's plain terms compel the contrary. It likely qualifies under one or more sub-definitions as well, but there is no need to examine all possible terms conferring enhancement eligibility. Because AG is indisputably an "investment company," it is expressly included in the statute's definition of a "financial institution."

Despite the express inclusion, the Defendant argues that I should find that AG is not an "investment company" by writing in a requirement that the "investment company" at issue must handle the investments of an unspecified number of investors greater than the number AG handles to qualify as an "investment company" under the guideline. The argument focuses on the Commentary to Section 2B1.1 which states, "Subsection (b)(15)(A) implements, in **broader** form, the instruction to the Commission in section 2507 of Public Law 101-647." (emphasis added). The referenced Section 2507 is entitled "increased Penalties in Major Bank Crime Cases" and instructs the Commission to increase the penalties for individuals convicted of certain offenses "affecting a financial institution (as defined in Section 20 of title 18 U.S.C." Pub. L. No. 101-647, Sec. 2507.

From this commentary, the Defendant extrapolates that "Congress was concerned about major cases affecting financial institutions," and evidently concludes her case is not "major."

4

Setting aside the invited attendant problem of defining "major," the Defendant's conclusion that Section 2B1.1 implicates only "major"cases stretches the section beyond its plain meaning. In contrast to Section 2507 of Public Law 101-647, Section 2B1.1 does not contain the word "major" or otherwise delimit in any way what sorts of crimes against financial institutions warrant sentence enhancements, provided the defendant derives in excess of $1 million in gross receipts from the misconduct.

Moreover, the Commentary to Section 2B1.1 specifically states that it is to be implemented more broadly than Section 2507 of Public Law 101-647. The Defendant appears to recognize that this language threatens her argument, but merely posits that "that broader form does not extend to companies like AG . . . (because) AG primarily managed a single family's real estate holdings." Doc. 20 at p.4. Again, the Defendant injects something into the guideline that is not there. There is no requirement that the financial crime affect a certain minimum number of persons. The Defendant offers no example of what she believes is encompassed by the "broader form;" but simply states that her case is not.

What is uncontroverted is that this Defendant padded her pockets with her employer's money to the tune of over $5 million. That's not peanuts. Were I even to accept her argument that the crime at issue must be "major," it is major by any yardstick of value, no matter the number of victims. Would the Defendant have the pluck to make the same argument if, for example, AG managed the Bill and Melinda Gates Foundation? It was started with the seed money of just one family, but beyond cavil it is a major institution.

The Government does not argue that AG is not a financial institution, but rather offers that it "did not consider AG to be a financial institution within the meaning of Sec. 2B1.1(b)(15)(A) at

5

the time it entered into a plea agreement with the Defendant." Doc.23 at p.2. Given its original representation to the Defendant did not factor in the possibility of a sentencing enhancement based on over $1 million in gross receipts, the Government submits that it cannot now pursue the enhancement, as doing such would breach its duties under the plea agreement. For this idea, the Government cites *United States v. Cooper*, 70 F.3d 563, 564 (10th Cir. 1995). The Government is correct in stating that *Cooper* does not allow it to pursue a sentencing enhancement when to do so would be inconsistent with its duties under the plea agreement, but the remedy under *Cooper* is not simply to ignore the applicability of the enhancement as it urges here. The Government's plea bargain was based on a misperception. As such, *Cooper* strongly suggests the proper course of action is to inform the Defendant of the sentencing enhancement, after which divulgement she would be afforded the opportunity to withdraw her guilty plea. By this memorandum, she is offered that opportunity now.

These objections are overruled.

### III. POSITION OF TRUST

The Defendant objects to the two level enhancement for abuse of a position of trust. The Defendant states that she did not have "substantial freedom in her duties that arise from discretionary authority signifying a position of trust" and that she was not involved in making "broad case-by-case decisions of the organization." As a result she argues she did not occupy a position of trust and the enhancement should not apply. This objection is overruled. The Defendant was entrusted with the money for AG's payroll. She had discretion concerning the issuance of payroll checks and that is precisely the discretion she exploited to commit and conceal her fraud.

### IV. PURCHASE V. DEBT PAID

The Defendant objects to the statement in the Presentence Report that properties were purchased with the stolen funds and asserts the purloined funds were used to pay the debt and/or debt service on the properties she acquired without significant initial equity payments. It was precisely those acquisitions at little or no cost that dragged her down into a financially disastrous vortex from which she attempted to extricate herself with funds she stole from her employer.

This is a distinction without a difference. All of these properties ─ save the automobile─ were encumbered and the purchase of each was an ongoing process. Until the debt securing a property was paid or otherwise transferred, she could not obtain clear title or be able to convey title without an assumption of the obligation by another. This objection is overruled even though it has no bearing on the guideline calculation.

## V. RESTITUTION

The issues of restitution are not clearly resolved. The final figure requires revision based on information not presently available. The $5,488,512.00 amount must be reduced by the net value of the properties the Defendant acquired that have sold and the net value of the inventory of real estate AG has agreed to accept and the Defendant has transferred. Additionally, $500,000.00 paid to AG by Travelers Insurance must be deducted from the restitution to be paid to AG and instead ordered paid to Travelers as a consequential victim after AG has been paid.

The parties shall have 30 days from the date of sentencing to amend, correct, and modify the order of restitution. Presently, the amounts and payees are:

Amstar
Gabe Fink, CEO
$3,059,026.00
1050 17th St., 23rd Floor
Denver, Colorado 80202

| | |
|---|---|
| Travelers Casualty and Surety Company of America Bond and Financial Claim Division 6060 South Willow Drive Greenwood Village, Colorado 80111 | $500,000.00 |
| Total: | $3,559,026.00 |

I find the Defendant does not have the ability to pay interest and it is therefore ordered the interest requirement is and shall hereafter be waived.

## VI. PRESENT OFFENSE LEVEL CALCULATION

Because of the number and details of the objections to the Presentence report affecting the guideline calculations, I will welcome any additional comments or objections from counsel and additional recommendations from the Probation Office. Presently, and subject to any further discussion, I find the correct guideline calculations to be:

Total offense level is 26 and Defendant's criminal history category is 1 which results in a recommended imprisonment range of 63 to 78 months, a fine range of $12,500 to $125,000 and a supervised release range of 1 to 3 years.

## VII. DEFENDANT'S MOTION FOR NON-GUIDELINE SENTENCE

The Defendant moves for a below guideline statutory or variant sentence of twelve months and one day. I have determined the correct calculations as required by *Gall v. United States*, 552 U.S. 38 (2007) and *Kimbrough v. United States*, 552 U.S. 85 (2007) and have given the guidelines respectful attention as required. Having done so, however, I will not impose a guideline sentence in this case and therefore reject the advice given as authorized by *Spear v. United States*, 555 U.S. 261 (2009).

I reject this advice because the Sentencing Guidelines themselves and their commentaries

offer not a clue as to this individual Defendant and her circumstances compared to other defendants or to her history. When I sought specific information from the staff of the Sentencing Commission, I was advised that the Commission had reviewed thousands of case files and arrived at conclusions apparently based on a gestalt formed by the review. When I asked how many of these thousands of cases involved forty-nine year old women with no prior arrests or convictions or how many such defendants were engaged in full-time employment with the victim organization or what the average or median length of sentences for them was, I was advised that such information was not available. In sum, the advice was a demonstration of *ipse dixit* and offered no probity whatever. The absence of hard data makes it impossible to form an opinion as to the reasonableness of the guideline recommendation or, for that matter, a just decision in which all relevant factors are put in balance. Without specific information, it is not possible to apply the sentence criteria set out in 35 U.S.C. Sec. 3553.

Additionally, on August 1, 2013 Defendant's counsel submitted a supplemental authority relating to this point that I have read. *United States v. Coursey*, __F.3d __, 2013 WL 3796393 (2nd Cir. July 24, 2013.) The concurring opinion by Judge Underhill observes that the fraud guideline is not the product of the Sentencing Commission employing an empirical study, as its designated mission, to establish past sentencing practices for convictions of this crime. Rather, he writes, "[t]he history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as the amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. *Id.* at 12. I agree and adopt Judge Underhill's statement as yet another reason for declining to impose a guideline sentence.

VIII. CONCLUSION

The parties' arguments regarding "sophisticated means" are SUSTAINED. The parties'

9

arguments regarding AG's status as a "financial institution" are OVERRULED. The Defendant's objection regarding her designation as a person in a position of trust is OVERRULED. The Defendant's objection to the Presentence Report as characterizing her use of the diverted funds as "purchasing" properties is OVERRULED. Final restitution payment amounts and recipients remain to be resolved, pending more information. I presently calculate the Defendant's offense level at 26, with a criminal history category of 1, which results in a recommended imprisonment range of 63 to 78 months, a fine range of $12,500 to $125,000 and a supervised release range of 1 to 3 years.

At sentencing I will proceed directly to the criteria specifically spelled out in Sec. 3553 and explain my reasons for the sentence to be imposed after considering all the available factual information in the Presentence Report and other documents and pleadings on file and listening to the arguments of both counsel and the Defendant should she elect to exercise her right of allocution.

In that regard, counsel and the Defendant are advised that I have studied the Presentence Report, the Defendant's Sentencing Statement and Motion for Variant Sentence, the Government's Response to the Defendant's Sentencing Statement and Motion for Variant Sentence and the 56 pages of letters written by 41 friends and relatives of the Defendant, the Government's Response to the Presentence Report and the Defendant's Response and Objections to the Presentence Report.

I am informed as best as possible in advance of the sentencing hearing and request counsel and the Defendant to direct their statements to Sec. 3553.

DATED: August 5, 2013                    BY THE COURT:

                                                                            *s/John L. Kane*

John L. Kane, U.S. Senior District Judge